In the

# United States Court of Appeals

## For the Seventh Circuit

No. 24-2744

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DAMOND K. WILEY, JR.,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Southern District of Illinois.
No. 3:22-cr-30111 — **Stephen P. McGlynn**, *Judge.*

ARGUED JANUARY 29, 2026 — DECIDED AUGUST 6, 2026

Before RIPPLE, LEE, and KOLAR, *Circuit Judges.*

RIPPLE, *Circuit Judge*. Damond K. Wiley, Jr., conditionally
pleaded guilty to one count of possession of a firearm as a
felon. He reserved the right to appeal the district court's de-
nial of his motion to suppress evidence obtained during a traf-
fic stop as well as the denial of his later motion to reconsider
the district court's refusal to hold an evidentiary hearing on
the suppression motion. He now renews those contentions in

this court. For the reasons set forth in this opinion, we affirm the judgment of the district court.

## I

## BACKGROUND

### A

Illinois State Police Troopers Renner and Schlau were on patrol on September 22, 2022, in East St. Louis, Illinois. They observed a blue BMW, driven by Mr. Wiley, turning onto a side street. The troopers followed the BMW as it turned down two more streets. The BMW then backed onto what appeared to be a driveway or a front lot of a property at 439 N. 21st Street. The property was "in a ramshackle state and [did] not have a roof."[1] The BMW pulled slightly forward, onto the street, then backed up again.

While the BMW was backing up, the troopers' cruiser came to a stop near the BMW. The cruiser's emergency lights were illuminated. After the troopers' cruiser came to a stop, the BMW ceased movement. At that point, the BMW was positioned with its front wheels slightly on the street and its body totally blocking the sidewalk.[2] The BMW had dark tinted windows, a violation of the Illinois Vehicle Code. 625 Ill. Comp. Stat. 5/12-503.

Immediately after the BMW stopped, Mr. Wiley exited the car from the front driver's seat and closed the door. One of the troopers then told him to get back into the car. Mr. Wiley

---

[1] R.34 at 5 n.1.

[2] App. R.25, Ex. 1 at 00:59–01:09 (Dash Camera) [hereinafter Dash Camera].

instead ran off, away from the street and behind houses along train tracks. Both troopers began to pursue him on foot, but Trooper Renner quickly stopped, returned to the BMW, and opened its front door. Then he walked to his patrol car and radioed for assistance. He also told at least one onlooker to stay away from the BMW. Trooper Renner then returned to the BMW, leaned inside, and retrieved a black .40 caliber pistol, which was in plain view on the driver's seat.

After he retrieved the gun, he heard that Trooper Schlau had apprehended Mr. Wiley. Trooper Renner returned to his patrol car again, and while doing so told an onlooker, "Do not touch this car, please."[3] The onlooker's response is inaudible, but Trooper Renner then said, "I didn't know if you knew him."[4] Trooper Renner then drove the patrol car a few houses down to assist Trooper Schlau.

While Trooper Renner was looking in the BMW's front seat and radioing for help, Trooper Schlau had continued the chase for Mr. Wiley. The two ran behind a few houses and along train tracks. Mr. Wiley then changed directions and turned back toward the street. Trooper Schlau, who had warned Mr. Wiley that he would tase him if he did not stop, then tased Mr. Wiley. Mr. Wiley fell, and Trooper Schlau attempted to detain him in a front lot a few houses away from the BMW.

Trooper Renner arrived. Trooper Schlau then subdued Mr. Wiley after a few moments of noncompliance and handcuffed him. Trooper Renner then radioed for emergency

---

[3] App. R.25, Ex. 2 at 01:38 (Trooper Renner Body Camera).

[4] *Id.* at 01:40.

medical services because of Mr. Wiley's wounds from the taser. While waiting for EMS to arrive, some of Mr. Wiley's relatives approached the scene to speak with the troopers and Mr. Wiley. Trooper Renner told one family member that he had stopped Mr. Wiley because his car had illegal window tinting.[5]

Once EMS arrived and began treating Mr. Wiley, he asked the troopers, "What did I do?"[6] Trooper Schlau told him he was "flying down this road," and they were trying to catch up to him.[7] Mr. Wiley said that he had just "bought the car."[8] Trooper Schlau asked him why he had been driving so fast. Mr. Wiley said, "I'm trying to make sure nothing was wrong with the car."[9] Trooper Schlau told him that was why they stopped him.[10]

About two minutes later, Mr. Wiley added, "I didn't even make it up the street. I was just trying to see how fast it goes. See and make sure nothing's wrong with it."[11] He also said that he is "not to have police contact," that he is "on papers" (probation), and that he is "on bond."[12]

---

[5] Dash Camera, *supra* note 2, at 07:04.

[6] App. R.25, Ex. 3 at 18:40 (Trooper Schlau Body Camera).

[7] *Id.* at 18:44.

[8] *Id.* at 18:48.

[9] *Id.* at 18:54.

[10] *Id.* at 18:56.

[11] *Id.* at 21:09.

[12] R.34 at 9.

While Troopers Renner and Schlau were with Mr. Wiley, another Trooper, Wells, conducted a "probable cause search" of the BMW "[d]ue to the odor of raw cannabis emitting from inside the vehicle."[13] He recovered 289.6 grams of cannabis and a black digital scale with cannabis residue. No weapons or contraband were found on Mr. Wiley's person. Trooper Renner confirmed through a record check that Mr. Wiley was out on bond for armed violence, unlawful possession of a firearm by a felon, and manufacture and delivery of cannabis. He also had been convicted of aggravated unlawful use of a weapon in St. Clair County. After Mr. Wiley's arrest, the BMW was towed from the scene, "consistent with ISP protocol."[14] An inventory search was conducted.

After the troopers took Mr. Wiley to jail, Trooper Renner filled out a police report documenting the arrest. The report recites that the troopers first observed the BMW making a right turn without a turn signal. As Trooper Renner followed, the BMW "clearly accelerated at a high rate of speed and was traveling faster than the 35 mile per hour (mph) speed limit …."[15] Then Trooper Renner saw the BMW make a left turn onto another street, not using a turn signal and failing to stop at a stop sign. As Trooper Renner followed, he saw the BMW backing into the yard of 439 N. 21st Street. Trooper Renner described the BMW as "backing into a yard in front of an abandoned home."[16] Trooper Renner activated the emergency lights as he pulled up to the BMW. Although Trooper

---

[13] R.37-4 at *7.

[14] R.34 at 10.

[15] R.37-4 at *6.

[16] *Id.*

Renner told a family member that he pulled Mr. Wiley over for illegal window tinting, the window tint was not mentioned in the report. However, in a "Prelog Questionnaire" for the Forensic Sciences Command of the Illinois State Police, a copy of which was attached to the arrest report, Trooper Renner described the "case circumstances" as a "[t]raffic stop for illegal window tint and speeding …."[17]

**B**

On September 24, 2022, the Government filed a complaint against Mr. Wiley in the Southern District of Illinois. It charged him with one count: possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1). On October 18, 2022, a grand jury indicted Mr. Wiley for the same offense. Then, on December 21, 2022, Mr. Wiley filed a motion to suppress the evidence obtained during his arrest and the statements that he had made afterwards.[18] He also requested an evidentiary hearing on the ground that his motion established material factual disputes with the Government's position.

The district court denied the motion to suppress as well as for an evidentiary hearing. The district court decided that the troopers had ample justification to conduct the traffic stop because they observed the vehicle's dark tinted windows, speed, failure to stop at a sign, failure to signal, and Mr. Wiley parking the car in a "questionable position."[19]

Next, the district court decided that the troopers had probable cause to search the vehicle because of the abandonment

---

[17] *Id.* at *12.

[18] R.28.

[19] R.34 at 5.

doctrine. The court reasoned that the Fourth Amendment does not protect a defendant from an unreasonable search if the place being searched is one where he has no legitimate expectation of privacy. In the district court's view, Mr. Wiley abandoned the BMW when he ran away and left it partially blocking the sidewalk and partially in the street. He also left it outside a dilapidated structure.

The district court added that, even if the BMW was not abandoned, the troopers had reasonable suspicion to search the passenger compartment of the vehicle. The court reasoned that the darkly tinted windows made it difficult to see into the car and to determine if anyone else was inside. It also was "impossible to know if the defendant would return ...."[20] Trooper Renner opened the driver's door and saw the gun in plain sight on the driver's seat before he learned Mr. Wiley was in custody. The court wrote that it "cannot say that a reasonably prudent man in similar circumstances would not be concerned about his safety or that of others."[21]

The district court decided that the troopers had probable cause to search the vehicle on the alternate ground that "a reasonably prudent person would believe that contraband or evidence of a crime will be found in the place to be searched."[22] Mr. Wiley, while in custody, said he was not supposed to have police contact, was on probation, and was on bond. The troopers verified he was on probation for a gun offense.

---

[20] *Id.* at 8.

[21] *Id.* at 9.

[22] *Id.*

Accordingly, they had probable cause to search the BMW without a warrant.

Finally, the district court determined that the vehicle was towed from the scene "consistent with ISP protocol and an inventory search was conducted."[23] Because Mr. Wiley had been lawfully arrested and the search of the BMW was "conducted as part of the routine procedure incident to incarcerating" him and "in accordance with established inventory procedures," the search would fall into the inventory search exception to the warrant requirement.[24]

After the district court denied Mr. Wiley's motion to suppress, Mr. Wiley filed a motion to reconsider the denial of an evidentiary hearing and, in the alternative, to supplement the pleadings.[25] It included four exhibits, including the police report and affidavits and property tax information from family members, to show that the property on which he had parked the car belonged to those relatives. Specifically, Mr. Wiley submitted sealed affidavits from family members to provide information about why he pulled the car into the driveway of that dilapidated house. Mr. Wiley submitted an affidavit from his relative stating that she owned the property at 439 N. 21st Street. She had given Mr. Wiley permission to park his car on the driveway of that property. And at the time of his arrest, Mr. Wiley was living with another relative across the street. The court denied the motion without a separate opinion. It stated that in its original order denying the motion to

---

[23] *Id.* at 10.

[24] *Id.* (citing *United States v. Jackson*, 189 F.3d 502, 508–09 (7th Cir. 1999)).

[25] R.37.

suppress, "the Court thoroughly considered and analyzed the same defense arguments that are being raised and argued in the motion to reconsider; therefore, any additional pleadings or argument would be an unnecessary impediment to judicial economy."[26]

Following the denial of his motions, Mr. Wiley conditionally pleaded guilty to possession of a firearm as a felon, in violation of 18 U.S.C. § 922(g)(1).[27] The court sentenced Mr. Wiley to 70 months' imprisonment and three years of supervised release.[28]

## II

## DISCUSSION

Mr. Wiley appeals the district court's denial of his motion to suppress the evidence and his motion to reconsider that ruling.

---

[26] R.40.

[27] On the same day, he entered into a plea agreement in another case. *United States v. Wiley*, No. 3-23-CR-30052, R.43 (S.D. Ill. May 30, 2024). In that case, he pleaded guilty to one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1), and one count of illegal possession of a machinegun, in violation of 18 U.S.C. § 922(o). The charges in that case stem from a separate incident on May 20, 2022. Mr. Wiley requested that both cases be reassigned to Judge McGlynn for sentencing. *United States v. Wiley*, No. 3-23-CR-30052, R.47 at 1 (S.D. Ill. July 24, 2024). Judge McGlynn set identical sentences for both cases to run concurrently.

[28] This appeal concerns only the firearm possession charge arising from the events on September 22, 2022. While Mr. Wiley also filed an appeal in the other case, he voluntarily dismissed that appeal and no issues related to that case remain.

**A**

Mr. Wiley first contends that the district court erred in deciding that the troopers had adequate justification to stop him. In reviewing the denial of a motion to suppress, we review findings of fact for clear error, and we review legal conclusions de novo.[29] A factual finding is clearly erroneous only when we "cannot avoid or ignore a definite and firm conviction that a mistake has been made."[30] Here, there was no suppression hearing, and the district court based its determination on the Government's opposition to Mr. Wiley's motion as well as the dash camera and body camera footage of the troopers.

Mr. Wiley contends that the videos do not support a reasonable belief that a traffic violation occurred. "Because traffic stops are typically brief detentions, more akin to *Terry* stops than formal arrests, they require only reasonable suspicion of a traffic violation—not probable cause." *United States v. Cole*, 21 F.4th 421, 427 (7th Cir. 2021). The level of suspicion required is less than probable cause, but "a mere hunch will not suffice." *United States v. Yang*, 39 F.4th 893, 899 (7th Cir. 2022). The officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion." *Id.* (citation modified). Reasonableness is an objective examination that looks at the totality of the circumstances to decide whether the officer reasonably suspected the individual had violated the law. The court should not consider the troopers'

---

[29] *United States v. Devalois*, 128 F.4th 894, 898 (7th Cir. 2025) (quoting *United States v. Yang*, 39 F.4th 893, 899 (7th Cir. 2022)).

[30] *Id.* at 899 (quoting *Yang*, 39 F.4th at 899).

"subjective motivations" for the stop. *Cole*, 21 F.4th at 428 n.1. What matters is whether "an officer reasonably thinks he sees a driver commit a traffic violation …." *United States v. Lewis*, 920 F.3d 483, 489 (7th Cir. 2019). Whether Mr. Wiley actually committed a traffic infraction is irrelevant so long as "there was an objective basis for a reasonable belief he did." *Id.* (citing *United States v. Cashman*, 216 F.3d 582, 587 (7th Cir. 2000)).

In *Cashman*, we addressed whether a crack in a windshield provided probable cause for police to stop a vehicle. Wisconsin law required that a windshield not be "excessively cracked or damaged." *Cashman*, 216 F.3d at 584 (citation modified). A trooper saw the crack in the windshield, but the defendant contended that the crack was not "excessive" under the law. *Id.* at 587. The pertinent question was not whether the defendant actually committed a traffic offense by having a particularly long or severe windshield crack. Instead, the question was whether it was reasonable for the trooper to believe the windshield was impermissibly cracked. Photographs made clear the crack was "substantial," and a trooper could therefore have concluded reasonably that it was "excessive." *Id.*

Mr. Wiley contends that the BMW was too far away from the troopers for the dash camera to record whether the windows were illegally tinted, whether the BMW was speeding, whether the BMW failed to display a turn signal, or whether the BMW failed to stop at a stop sign. The Government takes the position that whether the dash camera footage shows actual traffic violations is irrelevant to whether the troopers reasonably thought Mr. Wiley committed a traffic violation.

The dash camera footage does not make visible Mr. Wiley's alleged failure to signal, his speeding, and his

failure to stop at a stop sign. However, the dash camera footage of the troopers' vehicle does show the BMW's darkly tinted windows. As in *Cashman*, the tint visible on the dash camera footage shows that it was reasonable for the troopers to believe that the tint was impermissible. Because excessively tinted windows violate the Illinois Vehicle Code, the troopers had a reasonable belief that Mr. Wiley committed a traffic violation. Mr. Wiley's assertions to the contrary are not convincing. He claims that the BMW was too far away from the troopers to permit them to ascertain whether its windows were illegally tinted. Even if the car was too far away in the first seconds of the dash camera footage, it was not too far away once the troopers pulled onto the same street as the BMW and saw it reversing into the lot in front of the roofless house. And Mr. Wiley understandably does not contend that the troopers needed reasonable suspicion to follow him. *See United States v. Hammond*, 996 F.3d 374, 387–88 (7th Cir. 2021) ("A person travelling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another." (quoting *United States v. Knotts*, 460 U.S. 276, 281–82 (1983))). With respect to the other infractions, as the district court acknowledged, it was proper to rely on the officers' experienced observations as to the speed of the vehicle and the driver's failure to observe other established norms such as stopping at a stop sign and signaling a turn.

Mr. Wiley further contends that the district court failed to resolve inconsistencies between the dash camera footage and the police report as well as those between Trooper Renner's written report and his verbal statements during Mr. Wiley's arrest. After Mr. Wiley was handcuffed, Trooper Renner told one of Mr. Wiley's family members that he had stopped

Mr. Wiley because his vehicle had illegal window tinting.[31] However, the window tint was mentioned not in the first few pages of the police report but in an attachment to the report, which carried the same date as the report.

The constitutional reasonableness of a traffic stop does not depend on the actual motivations of the individual officers involved. *See Whren v. United States*, 517 U.S. 806, 813 (1996). Instead, we ask whether "the facts available" to an officer before he makes a stop warranted that stop. *District of Columbia v. R.W.*, 608 U.S. ___, 146 S. Ct. 1069, 1071 (2026) (per curiam); *see also Kansas v. Glover*, 589 U.S. 376, 381 (2020) (analyzing "whether the facts known to [an officer] at the time of the stop gave rise to reasonable suspicion"). The dash camera footage taken before the troopers told Mr. Wiley to get in the car makes the dark tint obvious, and Trooper Renner confirmed to Mr. Wiley's family that he conducted the stop because of the tinted windows. That the later-drafted police report mentions the tinted windows only in an attachment does not change the "facts known to" the troopers "at the time of the stop." *Glover*, 589 U.S. at 381. Those facts justified a reasonable suspicion that Mr. Wiley was violating the Illinois Vehicle Code.

**B**

Mr. Wiley next contends that the district court erred by concluding that the warrantless search of his car did not violate the Fourth Amendment.

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects,

---

[31] Dash Camera, *supra* note 2, at 07:05.

against unreasonable searches and seizures … and no Warrants shall issue, but upon probable cause ….” U.S. CONST. amend. IV. There are “a few specifically established and well-delineated exceptions” to the warrant requirement. *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). One of these exceptions is for protective searches.

The protective search exception permits officers to search a person if they “point to specific and articulable facts” indicating that “criminal activity may be afoot and that the persons with whom [they are] dealing may be armed and presently dangerous ….” *Terry v. Ohio*, 392 U.S. 1, 21, 30 (1968). The Supreme Court has authorized police to perform limited searches of people, vehicles, and premises for the purpose of protecting themselves from harm. *See id.*; *Pennsylvania v. Mimms*, 434 U.S. 106, 111–12 (1977); *Michigan v. Long*, 463 U.S. 1032, 1049 (1983); *Maryland v. Buie*, 494 U.S. 325, 334 (1990). In *Terry* and *Long*, the Supreme Court permitted officers to “assure themselves that the persons with whom they were dealing were not armed with, or able to gain immediate control of, a weapon that could unexpectedly and fatally be used against them.” *Buie*, 494 U.S. at 333. If an officer has reasonable suspicion “that the area to be swept harbors an individual posing a danger to those on the arrest scene,” then the officer may conduct a “cursory inspection of those spaces where a person may be found.” *Id.* at 334–35. The principles underlying the Supreme Court’s decision in *Buie* necessitate affirming the district court’s ruling here.

Trooper Renner had reasonable suspicion that Mr. Wiley was engaged in criminal activity. After the troopers pulled up, Mr. Wiley exited his vehicle, closed the driver’s door, then

stood and looked at the troopers. When they instructed him to get in the car, Mr. Wiley fled. Actions that are "consistent with" lawful behavior do not establish reasonable suspicion, *United States v. Paniagua-Garcia*, 813 F.3d 1013, 1014 (7th Cir. 2016), but officers are entitled to act on the facts as they know them at the time that they act, *Reynolds v. Jamison*, 488 F.3d 756, 765 (7th Cir. 2007) (analyzing the higher standard of probable cause and noting that "[t]he fact that an officer later discovers additional evidence unknown to her at the time of the arrest, even if it tends to negate probable cause, is irrelevant [because] we only care about what the officer knew at the time the decision was made"). Mr. Wiley lived just across the street from where he parked the BMW, but the officers did not know this fact at the time they observed him park in a dilapidated home's lot across the street. More fundamentally, rather than proceed toward his residence, Mr. Wiley fled in the opposite direction, along train tracks and behind multiple houses. Mr. Wiley's behavior contributed to Trooper Renner's suspicion that he was involved in criminal activity, and, therefore, justified further investigation. *See Illinois v. Wardlow*, 528 U.S. 119, 124–25 (2000).

Not only did Trooper Renner reasonably suspect that Mr. Wiley was engaged in criminal activity, but the officer also had reason to believe that the vehicle created a substantial risk to his safety as well as others. The vehicle's tinted windows made it impossible for Trooper Renner to confirm that, once Mr. Wiley had exited the vehicle, no one else remained inside. *See United States v. Jones*, 471 F.3d 868, 875 (8th Cir. 2006) (upholding the protective sweep of a vehicle under *Buie* where officers had the reasonable suspicion that the vehicle harbored an individual who could pose a danger to them). It was also impossible for him to know whether there

were weapons inside the BMW. Further, Mr. Wiley had fled the scene, and Trooper Renner was unaware whether Trooper Schlau had apprehended Mr. Wiley or whether Mr. Wiley would return to the BMW. *See United States v. Schmitt*, 770 F.3d 524, 531 (7th Cir. 2014) (noting that an officer lawfully conducted a protective sweep of a basement under *Buie* where he was not aware of whether the suspect had been apprehended at the time he entered the basement). The trooper was entitled to consider that Mr. Wiley's return to the BMW remained one of his surest ways out of the situation in which he found himself.

Trooper Renner permissibly opened Mr. Wiley's car door to protect himself, Trooper Schlau, and bystanders nearby. Trooper Renner's conduct reflected the concern for safety above all else. Indeed, dash camera and body camera footage shows that his search was brief and involved only opening the driver's door and immediately identifying the gun, which was laying in plain view on the driver's seat. This brief view of the interior of the car made it possible for Trooper Renner to confirm there were no other passengers. The district court properly denied Mr. Wiley's motion to suppress because Trooper Renner permissibly conducted a protective search of the BMW.[32]

---

[32] Because we uphold the search under the protective search doctrine, we do not address Mr. Wiley's contentions that he did not abandon his vehicle and that the automobile exception, the search incident to arrest exception, and the inevitable discovery exception to the warrant requirement do not apply.

## C

Mr. Wiley also contends that the district court abused its discretion when it denied him an evidentiary hearing on his motion to suppress the evidence obtained from the search of his vehicle. We review the district court's denial of a hearing on a motion to suppress for abuse of discretion. *United States v. Edgeworth*, 889 F.3d 350, 353 (7th Cir. 2018). Evidentiary hearings are "not required as a matter of course," but "only when a substantial claim is presented and there are disputed issues of material fact that will affect the outcome of the motion." *Id.* (citation modified). None of the issues Mr. Wiley raises would affect the outcome of his motion.

The district court denied Mr. Wiley's request for an evidentiary hearing because he had "not introduced any evidence that contradicts the photographs, audio, or video recordings submitted by the government."[33] Mr. Wiley now asserts that he was entitled to cross examine Trooper Renner about the reasons given by the troopers for the arrest at the scene and in the police report. He cited that inconsistency to challenge the determination of reasonable suspicion.[34]

---

[33] R.34 at 1.

[34] Mr. Wiley also asserts that he identified a material factual dispute over whether he lawfully parked his vehicle on a private driveway belonging to his relative. This claimed dispute relates both to whether he abandoned his vehicle when he ran from the troopers and whether law enforcement lawfully impounded the vehicle after he was arrested, thereby justifying the applicability of the inevitable discovery exception to the search warrant requirement. Because we do not address the abandonment issue or the impoundment issue as they relate to Trooper Renner's search of the BMW, we do not address them in the context of Mr. Wiley's motion to reconsider.

As we already have discussed, however, the dash camera footage showed that the BMW's windows were darkly tinted. The excessive tint alone provided the troopers with reasonable suspicion to stop Mr. Wiley. Whether the troopers told Mr. Wiley or wrote in their report that they stopped him for some other reason is irrelevant, because the dark tint was a fact known to the troopers at the time they stopped him. *Glover*, 589 U.S. at 381 (analyzing "whether the facts known to [an officer] at the time of the stop gave rise to reasonable suspicion"). Because an evidentiary hearing would not have changed the outcome of the motion to suppress, the district court did not abuse its discretion in denying one, or in denying Mr. Wiley's motion to reconsider.

## Conclusion

The judgment of the district court is affirmed.

AFFIRMED